THE TELEGRAPH and TIMOTHY DILLON v. CHRISTIAN LOETSCHER, Appellant, and THE DUBUQUE SPECIALTY MACHINE WORKS, Defendant.

Corporations: PROMOTERS. One who engages in the work of or-
1 ganizing a company for the purpose of purchasing from the owner certain patents and the machinery for manufacturing the same, aids in procuring subscriptions to stock and perfecting an incorporation for that purpose, is a promoter.

Secret profits: ACCOUNTING. A promoter of a corporation, on be-
2 coming a member and one of its directing officers, occupies a fiduciary relation to the organization and may be held to account for any advantage he may gain over other stockholders by a sale of property to the corporation in which he may have secretly acquired an interest.

Fraud: LIMITATIONS: LACHES. The statute of limitation will not
3 commence to run against an action for fraud until the fraud is discovered. Evidence held sufficient to excuse plaintiff's failure to sooner discover the right of action.

*Appeal from Delaware District Court.*—HON. A. S. BLAIR, Judge.

SATURDAY, DECEMBER 17, 1904.

ACTION in behalf of the Dubuque Specialty Machine Works for money received by Christian Loetscher for promoting the Dubuque Specialty Machine Works, and in aiding another to dispose of property to it.    Judgment as prayed, and Loetscher appeals.—*Affirmed.*

*McCarthy, Kenline & Roedell,* for appellant.

*William Graham* and *J. B. Powers,* for appellees.

LADD, J.—In April, 1891, A. Ferris Smith was owner of a certain patent right on a mortising machine, and of machinery to manufacture the device.    He suggested to citizens of Dubuque the propriety of organizing a company which should purchase these.    Thereupon the defendant and two others were appointed by a local board of trade as a committee to go to Chicago, Ill., to examine the mortising machine. Howie and the defendant did so, and seem to have reported that, though not perfect, the invention was valuable. · About a week later Smith returned to Dubuque, and, after some parley, induced the defendant, who was superintendent of the Farley & Loetscher Manufacturing Company, to permit him to have the mortising machine set up in its factory for exhibition.    He also arranged with Loetscher to help him promote a company for the purchase of the patent and machinery to manufacture the mortising machine.    The terms of the agreement are not open to serious doubt, though controverted in argument; the defendant insisting that he was merely to aid in organization of the company, and not in the sale of the patents and machine to it after being organized. The distinction is due to his construction of the contract. The object in organizing the company was that it should acquire the property of Smith, and this was perfectly understood by Loetscher.    In a ·deposition taken in 1896 he testified that Smith proposed that " he would have two hundred shares, or $20,000, issued to me, if I would help him pro-

mote this company.   Told him I didn't want any stock, because, if I should get any, I would subscribe for a little myself.   Finally told him if he would give me $10,000 cash, or its equivalent, I would take hold of the matter and help him push it through.   He claimed the company should be organized for $200,000, and he should get 95-200 of the stock and $50,000 cash for his patent, and he worked along that basis for about a month.   Finally Dr. Staples and other prominent men took hold of it, and commenced to deal with Smith.   They objected to the amount of cash to be paid to Smith.   Smith said to me: 'I'll have to reduce my cash bonus, and I want you to reduce yours.'   He said he would take $25,000 in cash, provided I would be willing to take $5,000.   He made an agreement to pay me $5,000 cash if the company was organized; otherwise I was not to have anything.   I subscribed for the stock myself then, and others subscribed through my influence.   That is about the way the company was started."

The very purpose of organizing the company was to buy of Smith and to manufacture the mortising machines. The subscription paper the defendant helped circulate recited

1. CORPORATIONS: promoters.

that "the assets of the company and the franchise are the deeds of patent of the United States," etc.   Manifestly Loetscher was to do precisely what he testified — "take hold and help him push it through." To accomplish this, it was not only necessary to organize the company, but to have it purchase the patent and machinery. This was Smith's ultimate object, as defendant knew; and it was to bring this about, as well as to secure subscribers for stock, that the agreement bound him to help Smith accomplish.   This view is further confirmed by the fact that no settlement was made until after the entire deal was consummated.   Defendant denies that he was to do more than help organize the company, and insists that he demanded payment as soon as this was done; but this is merely his construction of what was said between him and Smith, and

is not borne out by his testimony of the conversation had between them, and is inconsistent with the circumstances surrounding the transaction. The defendant exhibited the machine at the factory to prospective subscribers, and requested acquaintances to take stock in the company. As a machinist and inventor, his neighbors reposed confidence in him, and were unaware that he was in the secret employ of Smith. Stock to the amount of $75,000 was subscribed, and on the 25th day of May a preliminary organization was perfected, with defendant as one of the signers of the articles of incorporation and one of the directors, and afterwards as vice-president. As such officer he was present at nearly all the meetings of the board of directors, and advised and participated in the purchase of patents and machinery from Smith for which $6,000 was paid in cash, and 95-200 of the stock issued; and he was also to have $14,000 out of the first net earnings of the company. It is not material that Smith was paid less than originally contemplated in his contract with the defendant. The important facts are that the defendant, while acting as promoter in organizing the corporation for the express purpose of buying these patents and machinery, and acting as a director of the company after it was organized, was in the secret employment of Smith, from whom the purchase was made. It is idle to talk about compensation for services in such a case. The payment is for the influence the party may exert with those who trust him, and too often, though not in this instance, amounts to a betrayal of confidence for money. That his engagement was such as to constitute him a promoter, the record leaves no doubt. A promoter has been defined to be one who brings about the incorporation and organization of a company; who brings together the persons who become interested in the enterprise; who aids in procuring subscriptions, and sets in motion the machinery which leads to the formation of the corporation itself. 2 Cook on Stockholders, section 651. It is said to be a business, not a legal, term, "usually summing

up in a single word a number of business operations, familiar
to the commercial world, by which a company is generally
brought into existence." Bowen, J., in *Whaley Bridge*
*Calico Printing Co. v. Green*, 28 Wkly. Rep. (Q. B. Div.
1880) 351.

That such persons occupy a fiduciary relation toward
the corporation they seek to promote is settled by the authori-

2. SECRET PROF-    ties.    See 23 Am. & Eng. Enc. of Law, 234.
ITS: account-
ing.               In *Bosher v. Richmond, etc., Land Co.*, 89
Va. 455 (16 S. E. 360, 37 A. M. St. Rep. 879), the court
said:

A promoter is a person who brings about the incorpora-
tion and organization of a corporation. He brings together
the persons who become interested in the enterprise, aids in
procuring subscriptions, and ,sets in motion the machinery
which leads to the formation itself. Every person, acting
by whatever name in the forming and establishing of a com-
pany at any period prior to the company, is considered, in
law, as occupying a fiduciary relation towards the corpora-
tion. He is an agent of the corporation, and is subject to the
disabilities of such. He is guilty of a breach of trust if he
sells property to the corporation, purchased after he began
promoting, without informing the company that the prop-
erty belongs to him, or he may commit a breach of trust by
accepting a bonus or commission from a person who sells
property to that corporation.

The promoter is in the situation akin to that of agent
or trustee of the company, and his dealings with it must be
open and fair. Says Morawetz in his work on Corporation,
section 546:

If persons start a company, and induce others to sub-
scribe for shares, for the purpose of selling property to the
company when organized, they must faithfully disclose all
facts relating to the property which would influence those
who form the company in deciding upon the judiciousness
of the purchase. If the promoters are guilty of any misrep-
resentation of facts or suppression of the truth in relation to
the character and value of the property, or their personal in-

terest in the proposed sale, the company will be entitled to set aside the transaction, or recover any compensation for any loss which it has suffered.

The principle is not different from that involved when several persons are engaged in a joint enterprise for their mutual benefit. Each has the right to demand and expect from his associates good faith in all that relates to their common interests, and no one will be permitted to take to himself a secret and separate advantage to the prejudice of the others. *Getty v. Devlin,* 54 N. Y. 403. The principle was forcibly expressed by the Lord Chancellor in *Erlanger v. New Sombrero Phosphate Co., L. R.,* 3 App. Cases, 1218:

They stand, in my opinion, undoubtedly, in a fiduciary position. They have in their hands the creation and molding of the company. They have the power of defining how and when and in what shape and under what supervision it shall start into existence and begin to act as a trading corporation. If they are doing all this in order that the company may, as soon as it starts into life, become, through its managing directors, the purchasers of the property of themselves (the promoters), it is, in my opinion, incumbent upon the promoters to take care that in forming the company they provide it with an executive (that is to say, with a board of directors) who shall both be aware that the property which they are asked to buy is the property of the promoters, and who shall be competent and impartial judges as to whether the purchase ought or ought not to be made. I do not say that the owner of property may not promote and form a joint-stock company, and then sell his property to it; but I do say that if he does he is bound to take care that he sells it to the company through the medium of a board of directors who can and do exercise an independent and intelligent judgment on the transaction, and who are not left under the belief that the property belongs, not to the promoter, but to some other person.

*In re North Australian Co.* (Archer's Case) L. R. 1892, Ch. Div. vol. 1, page 322, Archer, being requested by the promoter to become a director, agreed to do so on the

former's promise that, if he should at any time wish to part with his shares, he would purchase them at the price Archer paid. After acting some time as director, Archer resigned, and the promoter took his shares at the price agreed. At that time the shares had no market value. The liquidators of the company asked that Archer be required to pay in the amount he had received from the promoter, with interest; and it was held that having regard to his position as director of, and therefore agent for, the company, whatever benefit or profit accrued to him under the indemnity constituted by his secret agreement with the promoter belonged to the company, and that the retention by him of the proceeds of the indemnity occasioned a loss to the company, for which he was accountable, with interest. In *Yale Gas Stove Co. v. Wilcox,* 64 Conn. 101 (29 Atl. 303, 25 L. R. A. 90, 42 Am. St. Rep. 159), Foley and Wilcox agreed that the latter should organize a corporation, to which the former should transfer certain patents at twice the price he was ready to take for them and $5,000 in capital stock, and of this Wilcox should receive one-half. The company was held entitled to recover from Wilcox all he had received. In *Chandler v. Bacon* (C. C.) 30 Fed. 539, Bacon & Cardoc were promoters of the National Color Printing Company, to be formed, and as such negotiated an agreement between the owners of certain patents by which they were to receive two-sixteenths of its capital stock, less 625 shares which were to be given to one Piper. Bacon was to be elected president, and Cardoc secretary. They offered and sold stock to the public at $7 per share; representing that the patents were to be paid for, but without disclosing the secret agreement by which they were to receive two-sixteenths of the stock without consideration. They were held liable to the receiver of the corporation for the value of the stock at the rate for which they disposed of other stock. See note to *Pittsburg Mining Co. v. Spooner,* 17 Am. St. Rep. 161. The authorities are

numerous, and our purpose has been to call attention to a few of the leading ones only.

As promoter and director, the relation of defendant to the company was that of agent, and it is elementary that an agent is disqualified from representing his principal in any transaction in which his personal interests are opposed to the interests of the principal. This rule applies in all cases where there is danger that the agent may be induced to use his powers as agent for his own advantage. The character of the interest is immaterial, provided it is substantial. While duplicity on his part may in a proper case prove a just ground for rescission, his principal may ratify the deal, and claim all the advantages, including any bonus or commission paid the agent by the other party. Indeed, the right of recovery in event of finding it a part of appellant's engagement with Smith to aid him in disposing of his property to the company is not seriously questioned.

II.    This action was not begun until September 20, 1900, and it is urged that the action is barred by the statute of limitations. The evidence, however, tends to show that the transaction was not discovered until 1896, when 3. FRAUD: limitations: laches. the defendant gave the testimony heretofore quoted from his deposition taken in litigation with Smith. Dillon was the managing director, and testified the fact that Loetscher had been employed by and received money from Smith as promoter, had never been mentioned in the meetings of the board of directors or stockholders, and that he had not learned of it till then. Another director's testimony was to the same effect. Others were not called as witnesses. The defendant swore he had never told any one, and Smith was a nonresident of the State. Any mention of it before the deal was completed would in all probability have proven disastrous to the enterprise, and it was not of a nature likely to be spoken of thereafter. That Loetscher was active in promoting the enterprise ought not to be held enough to put his associates on inquiry with respect

to his honesty in the transaction. It affected the interest of all subscribers, and the fact that the transaction was dishonest, together with the further fact that knowledge of it was purposely withheld from them, constituted fraudulent concealment. In view of the circumstances, we are inclined to regard the showing of failure to discover this prior to 1896 as sufficient.— *Affirmed.*