FIRST NATIONAL BANK OF COUNCIL BLUFFS, Appellee,

v.

ONE CRAIG PLACE, LTD., an Iowa Corporation, Guy Craig, Diane K. Craig, Melvin D. Kvasnicka, Marvin E. Seibold, Helen Seibold, Carmen A. Craig, and Beverly J. Craig, Defendants.

Melvin D. KVASNICKA, Marvin E. Seibold, Helen Seibold, Carmen A. Craig, and Beverly J. Craig, Appellants,

v.

FIRST NATIONAL BANK OF COUNCIL BLUFFS, Guy Craig, and Diane K. Craig, Appellees.

No. 64502.

Supreme Court of Iowa.

March 18, 1981.

C. R. Hannan of Perkins, Sacks, Hannan & Hughes, Council Bluffs, for appellants.

A. W. Tauke of Porter, Lash, Reilly & Tauke, Council Bluffs, for appellee Bank.

Considered by REYNOLDSON, C. J., and LeGRAND, UHLENHOPP, McCORMICK, and McGIVERIN, JJ.

UHLENHOPP, Justice.

■ This appeal involves the fiduciary duty owed by promoters, officers, and directors of a corporation to minority stockholders. The proceeding is in equity and we find the facts anew. *Rowen v. Le Mars Mutual Insurance Co.*, 282 N.W.2d 639, 645 (Iowa 1979). The facts are largely determinative of the case.

Midlands Corporation was a wholly owned subsidiary of First National Bank of Council Bluffs (the Bank). It was in process of constructing a shopping mall, and desired to lease space to tenants. Guy and Diane K. Craig, spouses (the Craigs), conceived the idea of operating a clothing store in the mall; Guy Craig had considerable previous experience in the clothing industry. They approached Stan Duysen, of the mall, and Dale Ball, president of the Bank. Under the mall's plan of operation, completed stores were constructed in the following way. The mall built the building itself and, when a building was rented, allowed a certain sum for finishing off the premises for occupancy by the tenant. The tenant then of course paid rent. The Craigs rented a space in the mall under a lease containing those terms.

The Craigs calculated that a store such as they contemplated would require about $100,000 capital. They had about $3000 in funds. Their tangible property consisted of their mortgaged home, "furniture, antiques, art works, jewelry, hobby collections," and cars, subject to a credit union loan. They reported their total net worth at $30,950.

The Craigs met with Robert Emerine, senior vice president of the Bank. He suggested that they apply for a Small Business Administration loan. They completed a loan application disclosing their financial situation, and presented it to Emerine. He filed it with SBA. Later the Craigs decided that their loan application would be fruitless, and they dropped it.

Realizing that they could not raise the necessary capital by a bank or SBA loan, the Craigs decided to form a corporation with a capitalization of $100,000, and to seek investors. The corporation would be named One Craig Place, Ltd. The Craigs obtained a certificate of incorporation— they were the promoters, officers, and directors of the corporation, and eventually the ostensible majority stockholders. They prevailed upon four friends (one was also a relative) to invest $12,000 each for stock, or $48,000 for 48,000 shares. This left $52,000 for the Craigs to raise for 52,000 shares. The problem was that they had only $3000 in funds. The Bank would not lend them the necessary $49,000.

The minority stockholders—Melvin D. Kvasnicka, Marvin E. Seibold, Carmen A. Craig, and John C. Williams—actually deposited $12,000 each in the Bank. They knew that the Craigs had to borrow personally for their shares.

Emerine was the Craigs' financial adviser. The enterprise also needed legal assistance. In connection with its legal work on this business, the Bank used the services of Frank W. Pechacek, Jr., an associate in the firm which was the Bank's general counsel. Guy Craig testified:

Q. What transpired or what took place from that point on as far as your meeting with the bank and their directions to you? A. At that time we got Frank Pechacek as a lawyer.

Q. How did that come about? A. Through recommendations at the bank. I didn't know anybody in Council Bluffs, so it was a name from the bank.

Q. Who would it have been? A. Well, I believe my first discussion was, again, with Stan Duysen, who was down the hall, who ultimately took me to Mr. Bob Emerine, and that is where the financial discussions started.

[Question and objection.]

Q. Had you filed any other financing or financial statements or documents with Mr. Emerine, other than the SBA? A. The SBA is the only thing I remember filing.

Q. Okay. And at that time you, I believe, testified you were still in the position of feeling that you had to have $100,000 to capitalize the corporation? A. I believe so, yeah.

Q. You so informed him of this need? A. I'm sure, yes, through the talks that is the figure that came to the top.

Q. He recommended that you see Mr. Pechacek? A. Yes.

Q. What happened following that? A. I met with Mr. Pechacek, and from day to day they worked together to get the $49,000 loan.

Eventually a plan was conceived for getting the Craigs their shares. Who conceived the plan is not completely clear although Carmen Craig testified:

Q. Did you have any knowledge of Guy borrowing $49,000 from First National Bank prior to August of 1976? A. Prior to August of '76, no. Guy called me at one period—this was before—I think—before the corporate structure was legal—and asked me if I had any idea of anyone who would be willing to cosign with him for his moneys that he needed to borrow to acquire his 49,000 shares of stock.

Q. Yes. A. I told him, no; I don't know of anyone who would be willing to do that. Several days later or a week later or sometime later he called me, and he said that Frank Pechacek had figured out a way that he and Diane would be able to borrow the money they needed to buy their 51 percent interest, or 52 percent, through the bank through the corporation. Only that is what I was told; that was fine, you know.

Q. You weren't aware that the corporate assets had been pledged? A. Absolutely not.

In any event, what actually happened is known. Two transactions would take place. In the first transaction, the Craigs would pay their $3000 toward their stock. Under the lease from the mall, the landlord was to provide $57,600 for finishing off the store for occupancy by the tenant. The Craigs would assign the lease to the corporation, and part of this $57,600 would be regarded as the equivalent of a payment of $49,000 by them to the corporation for their stock. The corporation would make its note for $8600 to the Craigs for the difference between $57,600 and $49,000. This transaction was carried out.

The parties (other than the minority stockholders, who were unaware of these happenings) apparently thought that the Craigs nonetheless had to raise $52,000 for their 52,000 shares, or at least that $52,000 had to be paid into and be held by the corporation along with the minority stockholders' $48,000, in order to have a capitalization of $100,000. Hence the second transaction was consummated. The Craigs had paid the corporation their $3000. Emerine verified that the Bank also actually had the minority stockholders' $48,000 on deposit. He then lent $49,000 on behalf of the Bank and had Mr. Pechacek prepare the documentation. Emerine did not, however, lend this money to the Craigs. He lent it to the corporation itself, taking a security interest in all of the corporation's assets and an assignment of the lease, as well as a personal guaranty by the Craigs and a security interest in their assets including a second mortgage on their home. Regarding this second transaction Guy Craig testified:

Q. So the corporation had no assets? A. No.

Q. Except for the money that the shareholders had contributed? A. Had sent down, right.

Q. You testified also that you told Mr. Emerine that you were borrowing this money to get your share of the corporation? A. I was borrowing $49,000, and yes; I needed to acquire 52,000 shares of stock.

Q. Did you make that fact known to Mr. Emerine? A. I believe I did.

Q. And the loan was consummated on that basis? A. Yes. Through Frank Pechacek.

As a result of this second transaction the corporation ostensibly had $100,000 in accordance with the stockholders' original intention. Actually, however, the corpora-

tion's note offset $49,000, leaving $51,000. The corporation issued 100,000 shares at one dollar per share—52,000 to the Craigs and 48,000 to the minority stockholders.

The landlord constructed the building, and the finishing was completed. The landlord provided funds for the finishing pursuant to its commitment and the funds went to the contractor. Guy Craig testified:

Q. If I may, to back up a little bit more, was any money ever transferred to One Craig Place [the corporation name] by Midlands Mall with regard to this construction credit commitment? A. Yes.

Q. How much money was given to them? A. I believe it was $57,500.

Q. When was that given to you? A. Shortly after the opening of the store. Again, it would have been probably in April; I would guess upon completion and upon satisfactory construction.

Q. Okay. And was that put into the One Craig Place account? A. It was either signed directly over to the Andersen Construction Company, or put in, and a check written; I don't recall which. It immediately the same day went to Herb Andersen of Andersen Construction, and I don't know whether I endorsed it over to him or whether I wrote a check for it and, in fact, put it into the checking account.

With the completion of the store, the corporation purchased inventory, fixtures, and equipment, and held a grand opening. One Craig Place embarked upon the clothing business on March 26, 1976.

Throughout the life of the corporation, however, from the formation through the operation to the liquidation, the Craigs practically disregarded the corporate entity and functioned as individuals. The Bank participated in this on occasion, as at the liquidation.

The store did not attract business and had little traffic. The lease with its substantial rental commitment was a heavy burden for the corporation. The Craigs struggled to develop volume, without success. The business went further and further behind.

In the view we take of the case, many of the ensuing details need not be stated. In July 1976 the Craigs called upon the minority stockholders for additional funds for operation of the store. These stockholders were as yet unaware that the corporation had borrowed $49,000 from the Bank and that the Craigs had contributed only $3000 to the capital of the corporation. They each lent the corporation $5000 on its notes. Guy Craig also lent the corporation $5000 on its notes; where he got the money does not appear. The corporation was then behind in its rent some $15,000 to $20,000 in addition to substantial accounts payable. The Craigs used the proceeds of the notes for those purposes.

The business continued to founder. An unaudited balance sheet showed a deficit of $58,569 as of July 31, 1976. The minority stockholders were unaware of the balance sheet. After examining it, Emerine refused to advance further credit. He did suggest that the Bank would aid the business "if there was something new injected into it by way of other borrowers with sufficient financial strength that we could perhaps loan the money to them and ultimately to Craig."

The Craigs again called upon the minority stockholders. Williams dropped out. The other three each had assets as shown by their net worth statements. They were aware of the substantial inventory in the store, but unaware of the corporation's obligation to the Bank for $49,000 and of contents of the balance sheet, and no one informed them of these facts. They believed that the corporation's assets were adequate to justify extension of further credit.

Mr. Pechacek prepared the documents, and the Bank lent the corporation $36,000 on its note about August 17, 1976. The note carried the collateral which was already pledged under the note for $49,000. The three minority stockholders executed written guaranties of the note to a limit of $12,000 each. The guaranties purported to cover also any other debts of the corporation to the Bank, subject to the limit of

$12,000 for each of the minority stockholders. The minority stockholders also executed an agreement subordinating their loans to those of the Bank. The subordination agreement is somewhat confusing at this point, as it recites that it shall not be construed as a guaranty of the corporation's debts to the Bank. Moreover, in his covering letter Mr. Pechacek stated that the agreement constituted a subordination but in no way made any type of guaranty.

An unaudited balance sheet of the corporation disclosed a deficit of $67,540 as of August 31, 1976. It also showed notes to the Bank totaling $85,000 ($49,000 plus $36,000). A copy of this balance sheet went to Seibold, one of the minority stockholders. Upon seeing these items, he became very upset. The other minority stockholders also learned this information. Communications were had with Guy Craig, and the fact came to light that the corporation had borrowed $49,000 to enable the Craigs to get their stock. Seibold testified:

> I raised the question, I thought it was improper that corporate funds would be pledged or corporate collateral would be pledged—corporate funds pledged as collateral for a stockholder obtaining stock in the company. I thought it was a very, very improper thing to do.

A meeting was subsequently held, conducted by Mr. Pechacek. An agreement was presented which recited that a dispute had arisen "as to the method and manner of payment of the 26,000 shares issued to Guy L. Craig and the 26,000 shares issued to Diane K. Craig," and that the Craigs "deny any claims of impropriety" as well as liability. The agreement stated that the Craigs shall issue a note from themselves to the corporation for $49,000, and provided the method of payment of the note. The instrument was signed by the Craigs. Apparently the minority stockholders did not sign it and the Craigs did not make the note. Even if the instrument had been signed it might have been of questionable validity since the minority stockholders did not have independent advice and the Bank would not release the corporation on its note of $49,-000 anyway. Asked about the agreement, minority stockholder Carmen Craig testified:

> That doesn't resolve anything. We were just attempting to get a legitimate balance sheet. I mean our corporation didn't have a $49,000 debt; Guy and Diane Craig had a $49,000 debt.

*See also* § 496A.18, The Code ("Neither promissory notes of the subscriber nor future services shall constitute payment or part payment, for shares of a corporation.").

The dispute was not settled. The note for $36,000 subsequently came due. The minority stockholders did not deny their liability on their guaranties of that debt, and they signed extensions of those guaranties.

The finances of the store worsened. The Craigs tried unsuccessfully to work out an arrangement regarding overdue rent. Eventually the mall gave the corporation a notice to quit. At this point Mr. Pechacek reported that he had a conflict of interests, and the Craigs retained other counsel.

Without the knowledge of the minority stockholders, an agreement was entered into among "Guy and Diane Craig, d/b/a 1 Craig Place, Ltd., hereinafter referred to as 'Craigs', and Midlands Corporation hereinafter referred to as 'Midlands', and First National Bank of Council Bluffs, hereinafter referred to as 'Bank'." Under the agreement the Craigs were to close the business and sell the corporation's property; the proceeds were to go to the Bank from property subject to its security interest and to Midlands from the other property.

A distress sale was held without a resolution by the corporation or notification of the minority stockholders. It brought $55,-711.13, which initially went to the Bank. Of this, $8800 was paid to the mall on delinquent rent, $27,274.45 was paid to the Bank on the principal of the note for $49,-000, leaving a balance of principal and interest of $27,489.55, and $19,636.68 was paid to the Bank on the principal of the note for $36,000, leaving a balance of principal and interest of $20,701.72. The Bank also received $3,495.34 by foreclosing the second

mortgage on the Craigs' home, and $980.34 which was in the store checking account when the business closed. These sums were also applied on the note of $49,000.

The Bank then demanded that the three remaining minority stockholders pay their three guaranties of $12,000 each. A dispute arose and the Bank commenced the present suit for a declaration of rights and obligations. The Bank claims that the three minority stockholders must pay their three guaranties of $12,000 each with interest, to be applied on the notes of $49,000 and $36,000 with interest, and that the proceeds of the foreclosure and of the store's checking account must also be applied on the latter notes. The three minority stockholders contend that the Craigs as promoters, officers, directors, and majority stockholders breached a fiduciary relationship in obtaining their stock by using the corporation's own note for $49,000 rather than by funds the Craigs owned or borrowed themselves; and that the Bank through Emerine knowingly participated in that arrangement. The minority stockholders therefore contend that the corporation's note is invalid as to them and the funds in the Bank's hands must be applied first on the note of $36,000, discharging that note and relieving them from any liability. They also ask for attorney fees and exemplary damages.

The trial court held for the Bank, granted its prayer, and dismissed the minority stockholders' contentions. This appeal by the minority stockholders followed.

If the Bank's instruments are taken at face value, the judgment must be affirmed. The notes for $49,000 and $36,000 are signed for the corporation by its officers; and the guaranties of the three remaining minority stockholders, guarantying the corporation's $36,000 note and its other debts to the Bank to a limit of $12,000 each, are signed by those stockholders. The notes for $49,000 and $36,000 purport to be due with interest, and are not fully paid.

But the case goes deeper than that. It is the not uncommon case of corporation promoters who are long on hope but short on funds.

The Craigs were the promoters of this corporation. They obtained 52,000 shares of its stock. In obtaining that stock, what was their duty as promoters toward the other prospective stockholders? Did they fulfill that duty? If not, what are the consequences? The case also involves issues regarding absence of demand and the relief to be granted.

I. *Duty of promoters.* We first inquire, what is the basic duty of promoters toward a corporation and prospective stockholders?

The general duty of a promoter was stated thus in *The Telegraph v. Loetscher,* 127 Iowa 383, 387–88, 101 N.W. 773, 774 (1904):

The promoter is in the situation akin to that of agent or trustee of the company, and his dealings with it must be open and fair. Says Morawetz in his work on Corporations, section 546:

"If persons start a company, and induce others to subscribe for shares, for the purpose of selling property to the company when organized, they must faithfully disclose all facts relating to the property which would influence those who form the company in deciding upon the judiciousness of the purchase. If the promoters are guilty of any misrepresentation of facts or suppression of the truth in relation to the character and value of the property, or their personal interest in the proposed sale, the company will be entitled to set aside the transaction, or recover any compensation for any loss which it has suffered."

The principle is not different from that involved when several persons are engaged in a joint enterprise for their mutual benefit. Each has the right to demand and expect from his associates good faith in all that relates to their common interest, and no one will be permitted to take to himself a secret and separate advantage to the prejudice of the others.

The court subsequently stated in *Hinkley v. Sac Oil & Pipe Line Co.,* 132 Iowa 396, 402–03, 107 N.W. 629, 632 (1906):

As promoters these men stood in a fiduciary relation to the company to be organ-

ized, and those who should subscribe for its stock. As such they were bound to act in good faith and to deal with them in perfect candor. "The principle upon which courts of equity proceed in these cases is a very familiar one. The promoter of a company, like its directors, is deemed to sustain towards the members of the company the relation of a trustee toward his *cestui que trust.* This being so he will not be permitted to speculate out of that relation, or to derive any secret advantages from it. He is bound to disclose to them fully all material facts touching his relation to them, including the amount he is to get for his services as promoter." Thompson on Corporations, section 457.

Likewise the court said more recently in *Des Moines Bank & Trust Co. v. George M. Bechtel & Co.,* 243 Iowa 1007, 1081, 51 N.W.2d 174, 216 (1952):

> As we have noted, the promoters, officers and directors of a corporation are the agents of and act for it, and indirectly for its stockholders, and they are the trustees or quasi trustees, at least, of the property of the corporation for the company and its stockholders. They occupy a fiduciary relation to the corporation on which relation the stockholders may rely. The corporate entity and the stockholders, in particular, may presume that these trustees will perform their duties with the diligence, honesty and the utmost good faith, inherent and implicit in their functions. They are not required to be ever on their guard and watchful lest those trustees misapply, destroy, embezzle, steal the corporate assets, or defraud them.

*See also* 18 Am.Jur.2d *Corporations* §§ 109–112 (1965); 18 C.J.S. *Corporations* § 120 (1939).

■ As a result of the fiduciary duty of promoters, stockholders whose trust has been betrayed may have relief when promoters issue themselves stock without giving full value. *Hinkley,* 132 Iowa at 411, 107 N.W. at 635; *see* 18 Am.Jur.2d *Corporations* § 256, at 779, § 268, at 791 (1965) ("stockholders who do not participate in the distribution of stock issued for an insufficient or illegal consideration, or consent thereto or acquiesce therein, may object to such issuance by a suit for cancellation, or otherwise"); 18 C.J.S. *Corporations* § 245, at 691, § 246, at 696 (1939).

II. *The Craigs' acts.* The *understanding* of the Craigs and the minority stockholders was that the corporation would have $100,-000 capital, of which the minority stockholders would provide $48,000 and the Craigs would provide $52,000, and that the Craigs would borrow if necessary to obtain their shares.

■ In addition, a *statute* intervenes at this point. The corporation was formed under chapter 496A of the Code. Section 496A.22 provides in part: "No certificate shall be issued for any share until such share is fully paid." Section 496A.18 provides:

> The consideration for the issuance of shares may be paid, in whole or in part, in money, in other property, tangible or intangible, or in labor or services actually performed for the corporation. When payment of the consideration for which shares are to be issued shall have been received by the corporation, such shares shall be deemed to be fully paid and nonassessable.
>
> Neither promissory notes of the subscriber nor future services shall constitute payment or part payment, for shares of a corporation.
>
> In the absence of fraud in the transaction the judgment of the board of directors or the shareholders, as the case may be, as to the value of the consideration received for shares shall be conclusive.

This section changes the Iowa valuation requirement from the "true value" to the "good faith" rule. C. Cosson, *Comment,* Iowa Code Ann. § 496A.18 (West 1962); *see* H. Henn, *Corporations* § 167, at 307 (2d ed. 1970); 18 Am.Jur.2d *Corporations* § 262 (1965); 18 C.J.S. *Corporations* § 239 (1939). It also eliminates the prior requirement of Executive Council valuation, thus taking the calculated risk of possible abuse. C.

Cosson, *Iowa Business Corporation Act*, 28A Iowa Code Ann. 1, 22–24, 34–35 (West 1962).

The Craigs did not comply with the parties' understanding or with the statute. They paid the corporation only $3000 in money. They purported to pay the remaining $49,000 in two ways. One was by assigning the lease to the corporation. But the lease is not shown to have had any value in excess of the rent reserved, even considering the clause for finishing the building. No attempt was made to show that the amount of rent to be paid was a bargain for the tenant. *See Watson v. Lewis*, 272 N.W.2d 459, 463 (Iowa 1978). Actually, the substantial rent was one of the factors that drove the business to the wall; the landlord's notice to quit actually precipitated the liquidation.

A sound argument cannot be constructed that the landlord's commitment to finish the store building for occupancy by the tenant, by the device of paying the contractor through the tenant, constituted a contribution of equity capital to the corporation. Landlords frequently remodel or complete demised premises for tenants. This is not a gift to the tenant or a payment for stock issued by a corporate tenant. The expectation is that the landlord will *recover* its investment in rent, or perhaps partially in the improvements themselves on termination of the lease, plus a return on its money. The landlord's funds to remodel or finish a building for a tenant do not provide a corporate tenant with uncommitted funds for capital; in the present situation the corporation needed about $100,000 to get started, in addition to the store premises; the landlord's provision of money to complete the store premises would provide none of this $100,000.

The landlord here invested in its own property, not in the corporation. That the landlord routed its money through the tenant to the contractor, rather than directly to the contractor, does not change the result. The money the landlord expended for *original construction* of the building was not a contribution of capital to the corporation; the situation is no different with the money the landlord expended for *finishing off* the premises for occupancy. Moreover, no attempt was made here to show that the finishing itself, paid for with the landlord's funds, became the tenant's property. On the contrary, the list of corporate assets at time of liquidation shows no such property owned by the corporation. Its assets consisted of merchandise, fixtures, and equipment, such as clothing, hangers, racks, tables, cash registers, and file cabinets. The landlord's finishing of its own building for occupancy did not fulfill the Craigs' obligation to provide the corporation with capital of $49,000.

Neither did the second way the Craigs purported to pay for their stock actually accomplish that end—the Bank's loan to the corporation of $49,000. Had that loan been to the Craigs, and had the Craigs then paid the corporation $49,000, they would have paid for their stock. But the corporation actually paid for *its own stock* it issued to the Craigs. The corporation was the primary obligor which would repay the note; the Craigs' guaranty of the note did not mean that they paid $49,000. *See Hinkley*, 132 Iowa at 404–05, 107 N.W. at 632 ("Nor does the fact that they guarantied the company's notes relieve them. They proposed that the company should repay and the guaranty was in no manner the payment of the shares issued to them.").

█ The acts of the Craigs in obtaining 49,000 of their 52,000 shares by assigning the lease and by causing the corporation to borrow from the Bank were in violation of both their understanding with the minority stockholders that they would contribute $52,000 in capital and section 496A.22 of the Code prohibiting issuance of certificates until the shares are fully paid. True, section 496A.18 ordinarily makes the judgment of the directors conclusive on the value of the consideration paid for stock, but the Craigs violated another statute. They engaged in

self-dealing without compliance with the provisions of section 496A.34 of the Code. They were on both sides of the transaction; they were the promoters and prospective stockholders acquiring the stock and the directors and officers issuing it on behalf of the corporation.

III. *Consequences.* What are the consequences of the Craigs' breach of fiduciary duty?

A. The minority stockholders assert that they are not liable on the Bank's $49,000 note and that the proceeds of liquidation must be applied on the note for $36,000, relieving them of liability. We recently stated that "we have never wavered from our insistence that those holding fiduciary positions must act with a high degree of fidelity; nor have we been reluctant to deny enforcement to contracts which violate that duty or which induce others to do so." *Rowen,* 282 N.W.2d at 650. In *Rowen,* we found that the transaction breached a fiduciary duty. We stated, "The transaction was thus contrary to public policy. We have long held contracts contrary to public policy are unenforceable." *Id.*

■ As between the corporation and minority stockholders, on the one hand, and *the Craigs,* on the other, the note for $49,000 to the Bank is a nullity because it was made in violation of the Craigs' fiduciary obligation and is contrary to public policy.

■ B. What then is the situation as between the corporation and minority stockholders, on the one hand, and *the Bank,* on the other? If the Bank participated in the Craigs' breach of trust, it likewise stands responsible for the consequences. The editors state in 18 C.J.S. *Corporations* § 142 (1939):

If there is not only not a full and fair disclosure by a promoter in dealings with the corporation, but affirmative misrepresentation, fraud, and deceit, then not only the promoter, but other persons as well, who stand in no fiduciary relation toward the corporation or its members, but who, with knowledge of the fraud, concur with the promoter in carrying out his fraudulent scheme, will become liable to the corporation in an action for what it has lost thereby. Likewise, third persons who participate with promoters in a fraud upon subscribers for stock in a corporation will be jointly and severally liable with the promoters to such subscribers for the fraud as in other cases of joint tort-feasors. Such liability on the part of third persons participating with promoters in a fraud upon the corporation or upon subscribers for its stock exists irrespective of their motives or the degree of their culpability, and although they originally may not have been parties to the fraudulent scheme and may not have shared at all in the profits of the fraud.

To the same effect regarding breaches of fiduciary relations, see *Rowen,* 282 N.W.2d at 654 ("We have already pointed out all who assist or cooperate in the breach of fiduciary duties—whether directors or not—are liable for the resulting damage."); *Des Moines Bank & Trust Co.,* 243 Iowa at 1082, 51 N.W.2d at 217 ("All persons conspiring or co-operating with or aiding and abetting the officers or directors of a corporation in defrauding the corporation are equally liable with them."); *Adolf Gobel, Inc. v. Skipworth,* 232 Iowa 382, 388, 3 N.W.2d 551, 554 (1942) ("All persons participating in a breach of trust are liable as principals to the beneficiaries.").

The question as to the Bank, therefore, is whether it knew of the Craigs' breach of trust and participated in it: If so, then the court will refuse to enforce the note for $49,000.

The minority stockholders urge that Mr. Pechacek arranged the entire capitalization of the corporation, that he was attorney for the Bank and that his knowledge was the Bank's knowledge. The Bank responds that Mr. Pechacek was the attorney for the corporation and his knowledge could not be charged to his other client, the Bank.

We need not decide the issue of vicarious knowledge through Mr. Pechacek, for we are convinced from the record that Emerine himself, senior vice president of the Bank and of long experience in banking, knew that the loan of $49,000 to the corporation was for the Craigs' stock. In addition to the testimony to this effect, the evidence shows that Emerine knew the background and development of this financing running back to the SBA loan application. He knew that the Craigs had only $3000 in money. The loan he made of $49,000 was the exact amount the Craigs needed above their own $3000 to acquire their 52,000 shares. Emerine verified that the other stockholders' money had actually been paid in before he made the loan. He made the loan to the corporation, not to the Craigs as principals, and participated with his eyes open in the Craigs' breach of trust. As between the corporation and minority stockholders on the one side, and the Bank, on the other, the note for $49,000 is a nullity.

IV. *Absence of stockholders' demand.* The Bank contends that a derivative suit cannot be maintained by the minority stockholders because of their failure to allege efforts to have an action brought by the directors or other shareholders or to allege sufficient reason for not making such effort. Iowa R.Civ.P. 44. This contention raises the threshold question whether the action is really a derivative suit.

Actions against promoters by stockholders or creditors may be to redress wrongs against them rather than derivative suits to redress wrongs against the corporation. This is commonly the case, as where promoters induce prospective stockholders to buy worthless stock or persuade creditors to extend credit improvidently, by the promoters' fraudulent representations or machinations. Cases of that sort are *Downey v. Byrd*, 171 Ga. 532, 156 S.E. 259 (1930), and *Frick v. Howard*, 23 Wis.2d 86, 126 N.W.2d 619 (1964). *See McCandless v. Furlaud*, 296 U.S. 140, 56 S.Ct. 41, 80 L.Ed. 121 (1935), *rehearing denied*, 296 U.S. 664, 56 S.Ct. 304, 80 L.Ed. 473 (1936); H. Henn, *Corporations* § 105 (2nd ed. 1970) ("Their remedies would be asserted in direct actions by themselves rather than direct actions by the corporation or derivative actions by shareholders."). On the other hand, actions by stockholders against promoters readily come to mind in which the objective is to obtain relief for the corporation for wrongs done to the corporation itself. These are essentially derivative actions whether the breach of trust is by promoters, directors, or others standing in fiduciary relationships. *See Holden v. Construction Machinery Co.*, 202 N.W.2d 348, 365–66 (Iowa 1972) (demarcation between nonderivative and derivative aspects of suit). What is the nature of the present action?

The action was initiated by the Bank as a creditor of the corporation against the Craigs, the corporation, and the three minority stockholders. The Bank held a fund obtained on liquidation and desired a declaration of rights and obligations. It claimed the right to apply the fund to its notes of $49,000 and $36,000 and it asked for judgment against defendants for the deficiency on the notes (to the amount of $12,000 and interest for each minority stockholder). The Craigs and the corporation answered and counterclaimed, praying for dismissal and for an accounting of the fund. The minority stockholders answered, asking for dismissal and for imposition of a trust on the corporation assets, application of the assets for the benefit of the minority stockholders, and application of the liquidation assets to the note of $36,000. They also counterclaimed and cross-claimed for breach of trust. They named the corporation as a co-party with them in these pleadings, but they alleged breaches running to themselves and requested relief for themselves. They prayed for judgment against the Craigs and the Bank for the price they paid for their stock, for punitive damages, and for attorney fees. Finally, this appeal is by the minority stockholders

themselves; they have not included the corporation as an appellant. In their brief in this court the minority stockholders state their desired relief as follows:

A declaratory judgment should have issued on the basis of the transactions as they were intended and not as prayed by the Bank for a declaratory judgment based upon a series of instruments prepared by their counsel. In view of the self-dealing, omissions, misrepresentations and overt fraud practiced by Guy and Diane Craig and the Bank herein, the declaratory judgment should have impressed a trust upon the proceeds of the sale of corporate assets and applied these proceeds to the note guaranteed by the minority stockholders. Any amounts remaining should have been paid to the corporation and applied towards attorneys fees for the minority shareholders.

Finally, the minority shareholders should have been awarded exemplary damages against the Bank who acted as a catalyst throughout the entire course of dealing as being the only method of firmly punishing and deterring those similarly situated in the conduct of their future business affairs.

From all of this and as the claims now stand, we conclude that in essence the case is a dispute between the Bank and the minority stockholders over the fund created by the liquidation, the foreclosure, and the checking account balance. The Bank desires to apply that fund in such way as to hold the minority stockholders on their guaranties, that is, by applying the fund to the notes of $49,000 and $36,000 and interest. The minority stockholders desire to have the fund applied to the note of $36,000 and to have the note of $49,000 adjudged invalid, so as to discharge them. They also want judgment for attorney fees and punitive damages. We hold that the minority stockholders are seeking relief for themselves, and that the action is not derivative in nature. Hence rule 44 of the Rules of Civil Procedure has no application.

V. *Relief.* What relief should be granted? We vacate the trial court's judgment, and grant relief as follows.

A. The note of $49,000 resulted from a breach of trust in which the Bank took part. The court will not enforce the note, and the Bank can have nothing on account of it.

The entire fund which the Bank received from the liquidation, the second-mortgage foreclosure, and checking account, together with interest on that fund at the legal rate from time of receipt by the Bank until disbursement under this decision, but excluding the amount previously paid to the landlord, is to be applied, first, upon the note of $36,000 and interest. Second, any surplus is to be applied pro rata upon the corporation's other indebtedness excluding the note for $49,000. Third, if any surplus still remains, it is to be distributed to the stockholders in the following proportions: the Craigs, 5.88%, and the four minority stockholders, 23.53% each.

The minority stockholders are discharged from any liability.

B. The minority stockholders originally asked for punitive damages from the Bank and on this appeal they still make that request. Sufficient actual damage appears here to permit an award of punitive damages. *See Pringle Tax Service, Inc. v. Knoblauch,* 282 N.W.2d 151, 154 (Iowa 1979). Punitive damages are not infrequently allowed in cases of breach of trust analogous to the situation before us. *Rowen,* 282 N.W.2d at 661–62. We have stated, however, that

[e]xemplary damages are not awarded as a matter of right; rather, their allowance rests with the factfinder. Their award "depends upon whether under the facts in a particular case such [an] award is appropriate in order to punish an offending party or discourage others from similar wrongful conduct." This determination depends upon the existence of malice—either actual or legal malice. "[L]egal malice . . . may be established by showing wrongful or illegal conduct committed or

continued with a willful or reckless disregard of another's rights."

*Feeney v. Scott County*, 290 N.W.2d 885, 892 (Iowa 1980) (citations omitted).

As a result of our decision, the Bank has lost $49,000 it lent to the corporation, and interest. While this is less than the investments and loans the minority stockholders altogether lost in the failure of the corporation, it is sufficiently substantial to punish the Bank and to deter others. Acting as the factfinder in this de novo appeal, we exercise our discretion to deny punitive damages of the Bank, in addition to its loss.

C. *Attorney fees.* Since this is not a derivative action and the parties are essentially enforcing their own rights, the general rule applies that attorney fees are not allowable. *Walters v. Bartel*, 254 N.W.2d 321, 322–23 (Iowa 1977); *Holden*, 202 N.W.2d at 365–66 (both nonderivative and derivative services; attorney fees denied for former, allowed for latter).

We return the case to district court for such hearings and orders as may be needed, if any, on motion of any party, to carry this opinion into effect.

REVERSED AND REMANDED.