**MIDWEST MANAGEMENT CORPORA-TION and Hollingsworth, Stephens, Clark & Koerner, Inc., Appellees,**

v.

**Morris STEPHENS and Stephens Industries, Inc., Appellants.**

No. 2–68757.

Supreme Court of Iowa.

July 18, 1984.

Rehearing Denied Aug. 16, 1984.

Robert E. Dreher of Dreher, Wilson, Adams & Jensen, Des Moines, for appellants.

Richard G. Santi of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, Des Moines, for appellees.

UHLENHOPP, Justice.

The central question in this appeal concerns the fiduciary duty owed by a corporate director to the corporation and its shareholders when he persuades the corporation to invest essentially all of its assets

in a new business venture. The case is bottomed on a breach of that duty, not on breach of contract. The parties argue numerous issues and we have considered all of them, but in this opinion we address only those which are dispositive of the appeal. The other issues do not alter the result. Another case based on the same facts was before us in *Midwest Management Corp. v. Stephens*, 291 N.W.2d 896 (Iowa 1980).

■ The proceeding is in equity, and we find the facts anew. *First National Bank v. One Craig Place, Ltd.*, 303 N.W.2d 688, 690 (Iowa 1981). We will affirm a decree in equity if it can be sustained upon any pleaded basis which is supported by the record, regardless of the basis used by the trial court. *Citizens First National Bank v. Hoyt*, 297 N.W.2d 329, 332 (Iowa 1980); *Krohn v. Judicial Magistrate Appointing Comm'n*, 239 N.W.2d 562, 563 (Iowa 1976).

Defendant Morris Stephens (Stephens) served as a director and chairman of the investment committee of Midwest Management Corporation (Midwest) from August 12, 1969, until December 29, 1971. In the summer of 1970, a venture by Midwest into the insurance business was failing and the corporation was searching for a new avenue of investment. During the same period, Stephens' son, John A. Stephens, together with Lyman J. Clark, Jr., and Richard K. Hollingsworth, became interested in starting a broker-dealer business to deal in securities. Those three individuals, however, did not have the financial wherewithal to capitalize such a business. Endeavoring to obtain financing, the three approached Stephens and convinced him that a broker-dealer business was an odds-on favorite to succeed. At that time Stephens did not have the necessary capital available and proposed submitting the plan to Midwest's board of directors.

On July 15, 1970, Stephens, John A. Stephens, Clark, and Hollingsworth explained the proposed venture to Midwest's directors at an informal meeting. Stephens emphasized the profit-earning potential of such a business, the experience and expertise of John A. Stephens, Clark, and Hollingsworth, who would actually operate the business, and the willingness of the proposed operators and himself to invest in the venture.

On July 29, 1970, Midwest's directors met officially and negotiated a proposal to submit to the shareholders later that day. An agreement was reached that Midwest would invest $250,000, Stephens would manage the new business, and John A. Stephens, Clark, and Hollingsworth would operate it. At least two plans were considered for investment by Stephens and the other three. Midwest wanted the instigators of the proposal to have a personal financial stake as an incentive to conduct the business profitably, while Stephens and the other operators were interested in assuring their own participation in foreseen profits. One plan involved a joint venture between Midwest and Stephens' company, Stephens Industries; Midwest would invest $100,000 and Stephens Industries $150,000. The other plan involved purchases of Midwest stock by Stephens and the operators. Stephens would purchase 100,000 shares over a five-year period at $1.50 per share, while John A. Stephens, Clark, and Hollingsworth would each purchase 25,000 shares over the same time period and at the same price. Overwhelming evidence demonstrates that the latter plan was adopted and that Stephens and the other three committed themselves to purchase 175,000 shares in total. Stephens later denied that he had agreed to any such stock purchase.

At a shareholders' meeting later that day, David Stanley, the original promoter of Midwest and a Midwest director, presented the broker-dealer business proposal to the shareholders. During that presentation he explained that Stephens, John A. Stephens, Clark, and Hollingsworth were committed to the purchase of 175,000 shares of Midwest stock at $1.50 per share. Several shareholders voiced concern that the stock purchase agreement be a commitment and not merely an option; they wanted the promoters of the new business to back it with their own funds.

Shareholders made clear that without such a commitment they would be reluctant to approve Midwest's investment of $250,000. At trial, several shareholders testified that but for the stock purchase commitment they would not have voted for approval. At a special shareholders meeting on September 19, 1970, the same explanations were repeated by Stanley and the same concerns were expressed by shareholders.

Stephens was present at both presentations. He did not attempt to change or correct the statements about the commitments to buy the stock. At trial, he testified as follows regarding his silence:

Q. Now, do you deny that at that [shareholder] meeting in your presence that David Stanley told the shareholders that you had committed—as part of the broker-dealer proposal that you had committed yourself to purchasing 100,000 shares of Midwest Management Company stock at $1.50 per share over a five-year period? A. I deny that I was bound by anything that Mr. Stanley said because we hadn't reached any agreement.

Q. That wasn't quite the question I asked you. Do you deny that Mr. Stanley made that statement in your presence at that shareholders' meeting? A. He may have made the statement, but I—it didn't mean anything to me.

Q. Did you render or make any objection or any comment at that meeting in response to your commitment to purchase 100,000 shares of Midwest Management Company stock at $1.50 per share over a five-year period? A. Mr. Santi, I was not negotiating with the Board or with the shareholders. I was negotiating with Mr. Stanley, and I have no reason to question what he was trying to put across, so since nothing had been agreed to, I did not raise any objections to what he said. There would be no reason to at this point. We were in negotiations.

Q. Well, if Mr. Stanley told the shareholders that you had agreed on July—on that date, July 29, 1970, to purchase 100,-000 shares of Midwest Management Corporation stock at $1.50 per share over a five-year period, are you saying that you would have not made any objection to that statement at that meeting? A. I would not at that meeting, no. There would have been no reason to because there was nothing finalized between Stanley and myself.

Q. Well, if I understand what you are saying, though, the statement that Mr. Stanley would have made at that meeting would have been absolutely false? A. Mr. Stanley was presenting a program that he wanted to put across, not necessarily what I wanted to do. We were in negotiations for some time about how to put this whole thing together. It wasn't clear at that point how it should be put together. He was trying to get a definitive action in order to proceed ahead with, I suppose, more negotiations.

Q. If Mr. Stanley had made that statement at that shareholders' meeting that you had agreed to buy 100,000 shares at $1.50 per share over a five-year period, would you have considered that to have been a false statement at that time? A. It was a false statement at that time because I hadn't agreed.

Q. But you made no objection or said anything to the rest of the shareholders calling their attention to the fact that that was what you had agreed to do? A. I didn't see any reason to.

Q. What were the shareholders being asked to do with respect to this broker-dealer business at that meeting? A. My memory of the meeting was primarily to decide whether they wanted to go into the broker-dealer business and in what manner.

Q. And at that meeting did they vote to go into the broker-dealer business, or at least the majority vote? A. They voted to give the Board the right to proceed and decide what the Board wanted to do.

Midwest's board went forward with the venture. The broker-dealer business was incorporated and began operations in Octo-

ber 1970. It never lived up to expectations. At first its losses were small, but in the summer of 1971 losses increased substantially despite an infusion of another $150,000 by Midwest. The business closed in the fall, and a final accounting showed that it lost $325,741.11.

Stephens, John A. Stephens, Clark, and Hollingsworth were scheduled to make their initial purchase of Midwest stock on December 31, 1971. They made no purchases, and Midwest brought an action against the four for breach of contract. The district court sustained the defendants' motion for summary judgment in that case, and Midwest appealed to this court. *See Midwest Management Corp. v. Stephens*, 291 N.W.2d 896 (Iowa 1980). While that case was on appeal, Midwest brought this suit in equity and sought and obtained a stay of the prior case pending the outcome of the present one. In its instant petition, Midwest sought equitable relief based on breach of fiduciary duty, fraud, and promissory and equitable estoppel. After three weeks of testimony, the trial court found for Midwest and awarded it judgment against Stephens for $325,741.11, plus interest, costs, and $25,000 in exemplary damages.

■ I. *Stephens' duty to Midwest.* A director of a corporation owes the corporation complete loyalty, honesty, and good faith. *Rowen v. Le Mars Mutual Insurance Co.*, 282 N.W.2d 639, 649 (Iowa 1979); *Holi-Rest, Inc. v. Treloar*, 217 N.W.2d 517, 525 (Iowa 1974); *Holden v. Construction Machinery Co.*, 202 N.W.2d 348, 358 (Iowa 1972); *Gord v. Iowana Farms Milk Co.*, 245 Iowa 1, 16–17, 60 N.W.2d 820, 829 (1953); *Des Moines Bank & Trust Co. v. Bechtel & Co.*, 243 Iowa 1007, 1081, 51 N.W.2d 174, 216 (1952); G.G. Bogert and G.T. Bogert, *Trusts and Trustees* § 544, at 407–09 (2d rev. ed. 1978). That duty is owed the corporation and its shareholders whenever the actions of the director concern "matters affecting the general well being of the corporation." *Yerke v. Batman*, 176 Ind.App. 672, 676, 376 N.E.2d 1211, 1214 (1978).

Stephens contends in negotiations for purchase of Midwest stock that he was not acting as a fiduciary, citing the rule that in the absence of fraud or looting a director can conduct the incidents which are normal to purchase and sale of stock according to his own best interests. *King Manufacturing Co. v. Clay*, 216 Ga. 581, 586, 118 S.E.2d 581, 585 (1961); *Yerke*, 176 Ind.App. at 676, 376 N.E.2d at 1214. We have no occasion at this time to consider the merits of such a rule, as it is plainly inapplicable here. The proper focus in this case is not on a mere purchase of stock. Rather, we must look to the underlying reason for negotiations to purchase stock.

■ Stephens was attempting to persuade his fellow directors and the shareholders to invest in a new business. The evidence shows that the directors were unwilling to make the investment without Stephens' investing his own money to demonstrate his confidence in the venture and to ensure his incentive to manage the business well. In Stephens' conduct of such negotiations with the directors and shareholders, we find that he was acting in connection with the general well being of the corporation and within his role as a fiduciary.

As a fiduciary, Stephens' first duty was "to act in all things of trust wholly for the benefit of his corporation." *Perlman v. Feldmann*, 219 F.2d 173, 176 (2d Cir.1955), cert. denied, 349 U.S. 952, 75 S.Ct. 880, 99 L.Ed. 1277 (1955). This encompassed a duty to disclose information to those who have a right to know the facts. *Rowen*, 282 N.W.2d at 651; *see* Restatement (Second) of Trusts § 170(2) (1959). Upon hearing statements in unequivocal terms at meetings on July 29 and September 19, 1970, that he had agreed to purchase 100,000 shares of Midwest stock at $1.50 per share, Stephens was bound to disclose the facts, as he perceived them, to the shareholders. He did not do so and knowingly permitted the shareholders to be led to believe statements which he now says are untrue and to give their approval to the broker-dealer business.

II. *Defenses.* In defense, Stephens raises the clean hands doctrine, laches, and waiver.

A. Clean hands. First, Stephens claims *Midwest's* hands are unclean because *he* had a conflict of interest when he agreed to purchase 100,000 shares of stock while his own bank was lending money to Midwest, and because of various alleged securities law violations by Midwest.

The question to be resolved, assuming that Midwest's conduct was wrongful, is whether the conduct complained of was connected with the present dispute. *Grandon v. Ellingson,* 259 Iowa 514, 523–24, 144 N.W.2d 898, 904 (1966). The conduct must appear to have injured, damaged, or prejudiced Stephens, or he may not invoke the doctrine. *Id.* The dispute here involves Stephens' breach of his fiduciary duty—his failure to object to statements made in the shareholders' presence that he had agreed to purchase 100,000 shares of stock. Assuming the wrongfulness of Midwest's conduct which Stephens alleges, we find that conduct has no relation to Stephens' failure to object to what he claims to be misstatements of fact at the shareholders' meetings.

B. Laches. Stephens' contention that he did not agree to buy stock did not become known to Midwest until October 1975 when he first claimed his true intentions were otherwise. Iowa Code § 614.4 (1983). Prior to that time he had relied on other defenses (statute of frauds and various alleged securities law violations). Midwest commenced this suit on September 29, 1976, well within the five-year time limitation of section 614.1(4) of the Iowa Code. "[L]aches cannot ordinarily be claimed against one beginning an action within the statute of limitations, absent special detriment to another." *Rowen,* 282 N.W.2d at 647. No special detriment has been shown, and we find no basis for application of laches.

C. Waiver. Stephens also argues that Midwest waived any claim it may have had when it rejected an offer he made to purchase Midwest's interest in the broker-dealer business on September 19, 1970, and when Midwest allowed a novation in his stock purchase agreement by permitting John A. Stephens to sign such a contract for 100,000 shares. A "waiver" requires a voluntary and intentional relinquishment of a known right with knowledge of the circumstances. *Iowa Grain v. Farmers Grain and Feed Co.,* 293 N.W.2d 22, 25 (Iowa 1980); *Grandon,* 259 Iowa at 521, 144 N.W.2d at 903. The fact Stephens concealed his true intention regarding the stock purchase agreement prevented rejection of his offer from being "voluntary and intentional".

A "novation" requires a previous valid obligation. *Eitzen's Estate v. Lauman,* 231 Iowa 1169, 1175, 3 N.W.2d 546, 549 (1942). Stephens denies that a valid obligation existed, and is in no position to assert novation.

III. *Damages.* The trial court awarded Midwest $325,741.11 of Stephens as compensatory damages, which equals the amount of loss Midwest sustained in the broker-dealer venture. We agree with this result.

Where a party is deceived into investing, as here, the measure of damages is the "loss of the investment less any value accruing to the [investor] from it." *Saxton v. Harris,* 395 P.2d 71, 73 (Alaska 1964). *See Grefe v. Ross,* 231 N.W.2d 863, 866 (Iowa 1975); *Baumchen v. Donahoe,* 215 Iowa 512, 517–18, 242 N.W. 533, 535–36 (1932); *Smith v. Peterson,* 282 N.W.2d 761, 764 (Iowa App.1979); *Gass v. Gamble-Skogmo, Inc.,* 357 F.2d 215 (7th Cir.) *cert. denied,* 384 U.S. 943, 86 S.Ct. 1464, 16 L.Ed.2d 541 (1966); *Greenwell v. Duvall,* 9 Utah 2d 89, 95, 338 P.2d 118, 121 (1959). The measure of damages is the same whether the underlying theory of liability is fraud or breach of fiduciary duty. *First National Bank v. One Craig Place, Ltd.,* 303 N.W.2d 688, 694 (Iowa 1981); *Charles v. Epperson & Co.,* 258 Iowa 409 at 430, 137 N.W.2d 605 at 617 (1965); *Des Moines Bank & Trust Co. v. George M. Bechtel &*

*Co.*, 243 Iowa 1007, 1035, 51 N.W.2d 174, 191 (1952).

Midwest invested $250,000 in the broker-dealer business on August 20, 1970, and lent $150,000 in addition to the new business in May and September 1971, for a total of $400,000. Of this total, Midwest lost $325,741.11.

Midwest made its investment in the broker-dealer business knowing that the venture was risky. Stephens points to this known risk and argues that his failure to purchase stock had no causal relation to the failure of the business. For all that appears from the evidence, this is true; the business would have failed even if Stephens had acquired the stock.

The evidence also demonstrates, however, that Midwest's shareholders were willing to take the risk of the broker-dealer business only if Stephens took the risk with them. By concealing his intention, Stephens led them to believe he would join in the risk. He is the one who induced them by this ruse to go into the venture, and his concealment of his intention is the wrong which determines the damages. But for that concealment the stockholders would not have authorized the venture in the first place. Their loss flows from their joining in the venture, and their joining in the venture flows from Stephens' concealment. *See Smith v. Peterson*, 282 N.W.2d at 765; *Greenwell v. Duvall*, 338 P.2d at 121. We thus find Stephens liable for Midwest's loss of $325,741.11. He must place the shareholders in the same financial situation as if he had not concealed his intention and they had not authorized Midwest to go into the venture.

IV. *Punitive damages.* The trial court also awarded Midwest $25,000 in punitive damages. Defendant contends the award is unjustified. An award of punitive damages is appropriate when a party acts with legal malice. Such malice may be established by showing wrongful conduct committed with a willful disregard of another's rights. *McCarthy v. J.P. Cullen &*

*Son Corp.*, 199 N.W.2d 362, 369 (Iowa 1972).

We find the award in this case was justified. Shareholders at the meetings on July 29 and September 19, 1970, had a right to know Stephens' true position, but he, a fiduciary, knowingly and purposely failed to inform them of his actual intention.

V. *Interest.* Stephens contends the trial court erred in allowing post-commencement interest; this interest is at the rate of ten percent per annum. Midwest argues on the other hand that it is also entitled to pre-commencement interest; this interest would be at the rate of five percent per annum.

A. We do not find merit in Stephens' argument that amended section 535.3 of the Iowa Code does not apply to lawsuits commenced prior to the effective date of the amendment, January 1, 1981, as to judgments entered thereafter. *See Janda v. Iowa Industrial Hydraulics, Inc.*, 326 N.W.2d 339, 345 (Iowa 1982); 1980 Iowa Acts ch. 1170, sec. 2. Post-commencement interest is thus allowable on the compensatory damages and is to run from the commencement of the present action until paid. Post-commencement interest will not run on the punitive damages of $25,000, *Dunshee v. Standard Oil Co.*, 152 Iowa 618, 132 N.W. 371 (1911); 22 Am. Jur.2d *Damages* § 264, at 359 (1965), but interest on those damages will run from the date of the new judgment. *Hall v. Montgomery Ward & Co.*, 252 N.W.2d 421, 426 (Iowa 1977).

B. Midwest claims that interest is due under section 535.2(1)(b) of the Code at the rate of five percent from August 20, 1970, and until commencement of the action, on its original investment of $250,000 in the broker-dealer business; and also that interest is due at the same rate from May 23, 1972, and until commencement of the action, on its net loss of $75,741.11 out of its loan of $150,000 to the new business. May 23, 1972, is the date on which the loss on the loan was finally ascertained.

■ Generally, "interest runs from the time money becomes due and payable, and in the case of unliquidated claims this is the date they become liquidated, ordinarily the date of judgment.... One exception to this rule is recognized 'in cases in which the entire damage for which recovery is demanded was complete at a definite time before the action was begun.'" *Mrowka v. Crouse Cartage Co.*, 296 N.W.2d 782, 783 (Iowa 1980) (quoting *Bridenstine v. Iowa City Electric Ry.*, 181 Iowa 1124, 1136, 165 N.W. 435, 439 (1917), *rev'd on other grounds, Menke v. Peterschmidt*, 246 Iowa 722, 69 N.W.2d 65 (1955)). In cases where investments were made in reliance upon false representations, this court has given a broad definition to the word "complete" and has allowed pre-commencement interest from the date the money was invested. *See Mopper v. Circle Key Life Insurance Co.*, 172 N.W.2d 118, 127 (Iowa 1969); *Mechanicsville Trust & Savings Bank v. Hawkeye-Security Insurance Co.*, 158 N.W.2d 89, 91–3 (Iowa 1968); *Charles v. Epperson & Co.*, 258 Iowa at 430, 137 N.W.2d at 617; *Weaver Construction Co. v. Farmers National Bank*, 253 Iowa 1280, 1291–92, 115 N.W.2d 804, 810–11 (1962); *Baumchen v. Donahoe*, 215 Iowa at 519–20, 242 N.W. at 536–37; *Fish v. White*, 188 Iowa 57, 59, 175 N.W. 748, 749 (1920); *Moore v. Fryman*, 154 Iowa 534, 541–42, 134 N.W. 534, 537 (1912).

■ In the present case, Midwest invested in the broker-dealer business when its shareholders were misled by Stephens' concealment. We conclude Midwest is entitled to pre-commencement interest on its compensatory damages. Those damages thus consist of $250,000; interest on that amount at five percent from August 20, 1970, to the commencement of this action on September 29, 1976, or $76,369.85; $75,741.11; and interest on that amount at five percent from May 23, 1972, to September 29, 1976, or $16,486.64; for total compensatory damages of $418,597.60.

The district court is directed to enter a new judgment against Stephens on remand for compensatory damages of $418,463.78 and for punitive damages of $25,000. In addition, the judgment is to order that interest runs on the compensatory damages at ten percent per annum from September 29, 1976, until paid, and on the punitive damages from the date of the new judgment until paid; and that Stephens pay the costs. *See Coachmen Industries, Inc. v. Security Trust & Savings Bank*, 329 N.W.2d 648, 651 (Iowa 1983); *Bump v. Stewart, Wimer & Bump, P.C.*, 336 N.W.2d 731, 738 (Iowa 1983); *Sheer Construction, Inc. v. W. Hodgman and Sons, Inc.*, 326 N.W.2d 328, 334 (Iowa 1982); *City of Sac City v. Bentsen*, 329 N.W.2d 675, 680 (Iowa App.1982).

Costs in this court are assessed to Stephens.

We return the case to district court for entry of a new judgment in place of the original one.

MODIFIED, AFFIRMED, AND REMANDED.