# IN THE COURT OF APPEALS OF IOWA

No. 22-1146
Filed October 11, 2023

**RAYMOND HEYDE, in his capacity as the Executor of the Estate of Milton Heyde, Deceased, and REINHOLD HEYDE,**
    Plaintiffs-Appellants/Cross-Appellees,

**vs.**

**DIETRICH HEYDE,**
    Defendant-Appellee/Cross-Appellant.
_____

Appeal from the Iowa District Court for Franklin County, Chris Foy, Judge.

Brothers appeal and cross-appeal the judgment entered by the district court on a petition for accounting. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS ON APPEAL; AFFIRMED ON CROSS-APPEAL.**

George A. Cady III of Cady & Rosenberg Law Firm, P.L.C., Hampton, for appellants/cross-appellees.

Dietrich Heyde, Williamsburg, Michigan, self-represented appellee/cross-appellant.

Considered by Schumacher, P.J., and Chicchelly and Buller, JJ.

**SCHUMACHER, Presiding Judge.**

Brothers appeal and cross-appeal the judgment entered by the district court on a petition for accounting and payment due concerning an organic farming operation. Upon our review, we affirm in part and reverse in part on the appeal and remand with directions. We affirm on the cross-appeal.

**I.      Background Facts and Proceedings**

Brothers Reinhold Heyde and Milton Heyde farmed together on land recognized by the United States Department of Agriculture (USDA) National Organic Program as a certified organic operation from 2000 to 2015. Only certified organic operations may sell, label, or represent products as organic. The process to become certified involves "two years [of farming] on your own with no prohibitive inputs" and then "[i]n the third year you would [become certified and] get the organic price" for the crops. The profit for the organic crops Reinhold and Milton sold was "twice as high" or "even higher" than the price for conventional crops.

Reinhold and Milton encountered difficulties with their organic farming operation in 2015 and lost their license. As a result, they were no longer certified to sell organic crops. The brothers considered farming on their own "without the organic license, [but they] would have only received conventional prices." So Reinhold and Milton decided "[t]he best option was to try to get . . . somebody to help [them] out and . . . get [an] organic license" and then they would use that license to market and sell their crops as organic.

Reinhold and Milton contemplated using a local farm management company, but they decided against it as the company would charge a fee of approximately 7.5 percent of the gross income. Eventually, another brother,

Dietrich, who lived in Michigan, agreed to help. For the 2016 season, Dietrich obtained his certification as an organic operator. Reinhold and Milton continued to manage the day-to-day farming operations. The three brothers agreed Dietrich "would market and sell the organic crops that Reinhold and Milton produced during the upcoming crop season, deposit the proceeds, pay for the crop inputs and other expenses of raising and harvesting the crops, and distribute any net profit to Reinhold and Milton." They also agreed Dietrich "could use the crop proceeds to reimburse any out-of-pocket expenses he incurred assisting Reinhold and Milton, but that Dietrich would not charge any fee for his services." The terms of the brothers' agreement were oral—none of the terms were reduced to writing.

The brothers initially believed the arrangement would last for one year because Reinhold and Milton were "to become recertified right away." But when this did not happen, the arrangement with Dietrich continued in 2017. Milton's health deteriorated and he could not remain as active in the farming operation, despite historically being "pretty much the farm manager." So Dietrich stepped in and assumed more of a role in the day-to-day duties of the farming operation for 2016 and 2017. Dietrich's additional duties were "completely unexpected" and required him to travel from Michigan to Iowa to be hands-on with the farming rather than the anticipated work as an organic operator.

Milton passed away in February 2018. It is unclear from the record whether Reinhold continued to farm after Milton's death. Enter a fourth Heyde brother, Raymond. Raymond successfully petitioned the court to admit the last will and testament of Milton to probate and appoint him as the executor of Milton's estate.

After he was appointed as executor, Raymond requested an accounting from Dietrich of the proceeds Dietrich collected from the farming arrangement.

When Dietrich failed to produce an accounting, Raymond and Reinhold (collectively, the Heydes) initiated this action in equity against Dietrich. The Heydes alleged a fiduciary relationship existed between the parties; demanded Dietrich provide an accounting "for all money and property received on [their behalf] and any expenses [Dietrich] claims were paid pursuant to the agreement"; and requested judgment "in any sum found to be due from [Dietrich] to [the Heydes] under the agreement."

Dietrich answered, admitting he paid expenses on behalf of the Heydes under the agreement but stating that any funds not used to pay bills had been distributed. Dietrich also asserted a counterclaim against the Heydes for compensation for "labor he provided to assist with planting, harvesting, field work and sale of the [Heydes'] crop."[1]

At trial, the court heard testimony from Reinhold, Dietrich, and Raymond; Maria and Carolyn (the Heyde family sisters); and Jack Ackerson, David Ragsdale, Robert Erlbacher, Jacob Butson, and Donald Butson, who served as hired farm help for the Heydes. The court also considered exhibits and the parties' post-trial briefs.

Following trial, the court entered an order for judgment for the Heydes. In reaching its decision, the court first concluded that Dietrich had not assumed a

---

[1] Dietrich requested compensation for services and costs relating to the 2018 crop year. The court found "[n]o testimony or evidence was presented in support of these counterclaims," so the court "den[ied] Dietrich any recovery on both of them." These claims are not raised on Dietrich's cross-appeal.

fiduciary role in his relationship with the Heydes, and therefore the court declined to impose "a heightened burden of proof on Dietrich" for distributions he made from the crop proceeds. The court next found Dietrich had failed to properly account for $213,164.25[2] of the crop proceeds that came into his hands under the arrangement he entered into with the Heydes for the 2016 and 2017 growing seasons but that he had "established a counterclaim against [the Heydes] for $9000."[3]

But rather than entering judgment for the Heydes in the amount of the difference, the court determined that because "the purpose of the arrangement" between the Heydes and Dietrich was a plan "to scam the system," the court applied "the equity maxim of clean hands." The court reduced the judgment for the Heydes against Dietrich to $74,164.25.[4] Dietrich moved for a new trial, which the court denied. This timely appeal and cross-appeal followed.

## II.    Standard of Review

This proceeding is in equity, so we review the parties' claims de novo. *See* Iowa R. App. P. 6.907; *Mlady v. Dougan*, 967 N.W.2d 328, 332 (Iowa 2021). "We give weight to the factual findings of the trial court, but we are not bound by them." *Mlady*, 967 N.W.2d at 332 (citation omitted*)*. "A district court's order imposing

---

[2] Based on computational error, the court found this amount was $213,164.25. The correct computation is $212,417.25 ($445,641.93 minus $152,344.89 minus $2051.35). The difference represents the miscalculation of the lodging expenses, as detailed in this opinion.

[3] Dietrich sought compensation for his labor in the amount of $27,360. The court found Dietrich was entitled to recovery against the Heydes for his labor at a rate of "50 days times 9 hours per day times $20 per hour," which totaled $9000.

[4] The court later entered a supplemental ruling "further expla[ining] the manner in which it calculated the damages due" to the Heydes but declining to apportion the judgment between them.

discovery sanctions will not be disturbed unless the court abused its discretion."
*Troendle v. Hanson*, 570 N.W.2d 753, 755 (Iowa 1997).

**III.** **Fiduciary Relationship**

The Heydes contend the court erred in failing to find a fiduciary relationship existed between them and Dietrich, which if established, "shifts the burden to Dietrich to justify the expenses" he alleged to have paid on behalf of the Heydes' farming operation. To support their claim, the Heydes point to "the broad definition of a fiduciary relationship, as set forth in *Kurth* [*v. Van Horn*, 380 N.W.2d 693 (Iowa 1986)] and *Weltzin v. Cobank, ACB*, 633 N.W.2d 290 (Iowa 2001)," and argue these cases "accurately establish[ ] the law to be applied" in determining whether a fiduciary relationship exists.

Generally, "[a] fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Kurth*, 380 N.W.2d at 695. "Such relationship exists when there is a reposing of faith, confidence and trust, and the placing of reliance by one upon the judgment and advice of another." *Weltzin*, 633 N.W.2d at 294. Because diverse circumstances give rise to a fiduciary duty, the individual facts of a case must determine whether a fiduciary duty exists. *Kurth*, 380 N.W.2d at 696. Indicia of a fiduciary relationship include: "the acting of one person for another; the having and the exercising of influence over one person by another; the reposing of confidence by one person in another; the dominance of one person by another; the inequality of the parties; and the dependence of one person upon another." *Id.* (citation omitted).

Applying these principles to these facts, we cannot find Dietrich controlled his brothers' actions or activities; the parties' agreed Dietrich's role was simply to provide a way for the Heydes to market and sell their crops as organic, under Dietrich's certification. *Cf. Weltzin*, 633 N.W.2d 294–95 (declining to find a fiduciary relationship despite a possibility the creditor encouraged the debtor to merge and failed to act to protect the creditor's interests). And despite testimony of the close familial relationship the brothers shared, there is no evidence any party influenced or dominated another or there was inequality or dependence between the parties. *Cf. Kurth*, 380 N.W.2d at 694 (finding no evidence the customer "relied upon the bank for advice" or that the bank "ever acted as an investment advisor" for the customer).

The parties agreed Milton historically "made all the decisions" relating to the Heydes' farming operation; Dietrich had no expertise the Heydes relied on;[5] and the Heydes hired out for labor and custom farming. *See Irons v. Cmty. State Bank*, 461 N.W.2d 849, 852–53 (Iowa Ct. App. 1990) ("The various conversations the customer had with bank officers concerning loan repayments, price and sale of crops, and other matters certainly do not raise the relationship to the special and elevated rank of fiduciary."). The evidence shows Dietrich merely retained the organic certification for the Heydes, and as the district court noted, "Milton and Reinhold used Dietrich as a middleman to market and sell their crops."[6] *See Linder*

---

[5] Indeed, Raymond testified, "Dietrich never sat on a tractor. He never talked about farming. He didn't know anything about farming. He didn't know the business end of a disk."

[6] As the district court observed,

> In framing the burden of proof Dietrich carries, [the Heydes] cite cases that describe what the donee must show to validate a gift

*v. Midwest Benefits, Inc.*, No. 00-1658, 2001 WL 541450, at *3 (Iowa Ct. App. May 23, 2001) (finding no fiduciary duty between the parties, noting, "Linder simply helped Midwest to make connections with businesses, which allowed its employees to make sales"). And although the Heydes hoped to sell their crops as organic under Dietrich's certification, there was no guarantee their arrangement would succeed, and in many ways, it didn't.[7] *See, e.g.*, *Albaugh v. The Rsrv.*, 930 N.W.2d 676, 686 (Iowa 2019) (finding no fiduciary relationship between parties despite a claim a resident "put her confidence in the Reserve to protect her entrance fee and supplemental amount," when the application agreement "stated there was 'no guarantee [the resident] will recover the entire Entrance Fee, the entire Supplemental Amount, or such other funds as may have accrued during [her] residency within the Development'").

Upon our review of the indicia of a fiduciary relationship as applied to these facts, we cannot find Dietrich had a fiduciary duty to the Heydes. We affirm on this issue.

---

made by a person with whom the donee had developed a confidential relationship. . . .
. . . Here, Milton and Reinhold did not make a gift of any kind to Dietrich. Instead, Milton and Reinhold used Dietrich as a middleman to market and sell their organic crops. The Court finds that the role assumed by Dietrich vis-à-vis his brothers was more akin to that of a consignee of their crops than as any kind of fiduciary.

[7] For instance, Carolyn testified, "Well, in the early fall [2017], when they saw that the crop was looking bad, then [Milton] and Reinhold decided that they did not want Dietrich to be the operator for the—for 2018." Several witnesses agreed Dietrich "waived his portion of the rent for 2017" "because the crop was so bad."

## IV.  Burden Shift

The Heydes next claim the court "erred in failing to shift the burden of proof to [Dietrich]" to show by "clear and convincing evidence that he was entitled to reimbursement for [his alleged] expenses."  This argument is based on the presence of a fiduciary relationship between the parties, a claim we found unpersuasive above.  Accordingly, we conclude the district court correctly declined to "impose a heightened burden of proof on Dietrich."  As the court stated, "So long as he establishes the validity and necessity of any particular expense or disbursement by a preponderance of the evidence, the [c]ourt will treat the amount of that item as properly accounted for by Dietrich."  Even so, we interpret the Heydes' claim to include challenges to several expenses claimed by Dietrich, which we now address under the appropriate standard.

The parties do not dispute that Dietrich received crop proceeds in a total amount of $445,641.93 that he needed to account to the Heydes.[8]  The record concerning the proceeds and expenses is complicated by the fact that Dietrich did not use a separate account for the organic farming operation, instead commingling funds with his business and personal accounts.  The parties agreed Dietrich used $76,583.90 of the crop proceeds to pay third parties for "legitimate and necessary expenses," and Dietrich paid $2244.54 to become certified as an organic operator.  The parties also agreed Dietrich distributed $144,954.89 by wire transfer to Milton from crop proceeds and that Dietrich should receive a credit of $90 for wire transfer

---

[8] Between November 2016 and March 2018, Dietrich received $389,100.33 in proceeds from the sale of the Heydes' crops, and he received another $56,541.60 in crop insurance funds.

fees he paid. The undisputed payments from crop proceeds totaled $223,873.33, leaving $221,768.60 remaining for which Dietrich needed to account to the Heydes. Ultimately, the district court found Dietrich was entitled to credit for an additional $17,604.35 for expenses, which are challenged on appeal by the Heydes.

A.    Cash payments to Milton

Dietrich claimed he made thirty-four payments to Milton in cash between June 2015 and January 2018, totaling $50,877. The district court found evidence to show Dietrich made five cash payments to Milton that he should be credited for, totaling $7300. The court explained:

> The evidence showed that Milton often conducted business in cash. Dietrich testified credibly that he gave Milton cash several times. Even so, the Court finds that it is only appropriate to give Dietrich credit for those distributions made in cash after he received the first crop proceeds check from Pipeline Foods and which have other support in the record. The dates and amounts of these distributions and the page of the exhibit that the Court found to support the validity of each are set out below:

| Date | Amount | Evidence Source |
| --- | --- | --- |
| March 5, 2017 | $1000 | Exhibit 111, page 6 |
| April 4, 2017 | $500 | Exhibit 111, page 2 |
| June 9, 2017 | $4000 | Exhibit 111, page 4 |
| July 12, 2017 | $300 | Exhibit 111, page 3 |
| August 4, 2017 | $1500 | Exhibit 111, page 9 |

The Heydes challenge this finding, claiming it "appears to be based solely on Dietrich's testimony that he withdrew money from an ATM machine various times and . . . that he provided the cash to Milton." That contention misstates the

record. Rather, Dietrich specified he only used the ATM to withdraw cash "for [his] own personal money." He testified he had used the same "Bank-Genie ATM [his] whole life," "because it's close to work and it's on [his] way home." But when he withdrew cash for Milton, Dietrich stated he "walked into the bank to—to withdraw cash" "because [he] could withdraw more than from an ATM, plus [he] had a receipt that [he] gave to Milton." Exhibit 111 depicts withdrawal slips from Fifth Third Bank, accurately indicating the dates and amounts Dietrich alleged he withdrew.

But the Heydes persist, "Milton's bank records never reflected that he received any of these cash distributions that Dietrich claimed he paid," and Milton did not sign "any receipts for the cash." Dietrich testified he got a receipt "every time" he withdrew cash from the bank, which "were in the—the bank cards, the money cards," and "[e]very one of them went to Milton." According to Dietrich, "Milton logged every one of those, every time" in a durable notebook he kept with him at all times.[9] Milton's main farm hand, Robert Erlbacher, similarly testified Milton "wrote down everything" and kept his notebook with him in a leather bag.[10]

Dietrich also testified Milton did not deposit the cash but used it to pay workers or for other expenses; "[h]e dealt with cash, you know, every day."[11] Erlbacher worked "forty-plus" hours each week for Milton and testified he and Milton "had an agreement" that Milton always paid in cash. According to Erlbacher,

---

[9] According to Dietrich, "[Milton] kept track. Every time I gave him cash, he kept track; and every time I told him I made a payment to Don Butson or whoever, he kept track. . . . That logbook was incredibly important."

[10] Unfortunately, Milton's notebook disappeared and was never produced during this action.

[11] Although Milton paid Don Butson with checks, Butson "always heard he liked cash."

Milton always carried cash and paid him at the end of each day. Jack Ackerson similarly testified that Milton "paid [him] cash" for his work on the farm. Erlbacher also stated he rode around with Milton "every day" and recalled seeing receipts and bank envelopes "everywhere in his car." Dietrich testified, "When Milton passed away, his bedroom had all kind of receipts from Fifth Third [Bank], which there's no Fifth Third in Hampton, you know, Iowa. So the money cards were in there. There was receipts. His dashboard of his truck had all kinds Fifth Third money cards and receipts."

Upon our review, we conclude Dietrich established $7300 in cash payments to Milton by a preponderance of the evidence.

B.    Lodging expenses

Dietrich claimed lodging expenses in the amount of $3722.39 for nineteen stays at the Gold Key and AmericInn motels in Hampton between June 2015 and February 2018. The district court found one of the stays (July 20–26, 2017), totaling $235.74, was for Milton and should be credited to Dietrich. The court further found Dietrich should be credited for an additional $1068.61 for his stays at the Gold Key that were "supported by receipts." The court explained:

> Finally, the Court will give Dietrich credit for $747 in room charges he paid the Gold Key Motel to stay there for 15 nights in June and early November of 2016, $1068.61 in room charges he paid to stay at the Gold Key Motel for 22 nights in June and July of 2017, and $235.74 in room charges he paid the Gold Key Motel for Milton to stay there for 6 nights in July 2017. All of these room charges are supported by receipts . . . . The Court specifically finds that in both 2016 and 2017, [Dietrich] spent at least 25 days back in the Hampton area each year helping Milton and Reinhold with planting, harvesting, and other field work. The Court has not given Dietrich any credit for room charges he supposedly paid to stay at the AmericInn because they are not supported by any receipts. The

room charges for which the Court will give Dietrich credit total $1304.35.[12]

On appeal, the Heydes "have no objection to giving Dietrich credit for paying for the rooms for Milton, . . . which total $235.74." But they claim, "The rest of the room charges appear to have been incurred by Dietrich," and "[t]he evidence from all of the [Heydes'] witnesses indicate Dietrich had agreed to not charge for travel expenses." The record belies this contention. At trial, Reinhold acknowledged Dietrich "was supposed to charge us modest fees for traveling and motel lodging . . . ." We also note exhibit 114 includes receipts from the Gold Key motel, accurately indicating the dates and amounts of Dietrich's stays.

Upon our review, we conclude Dietrich established lodging expenses in the amount of $2051.35.

C.     Labor and field work

In his counterclaim, Dietrich sought compensation for the value of the labor he provided to help the Heydes with field work during 2016 and 2017. Dietrich requested $27,360 for 114 "days working in Iowa or spent traveling" at a rate of $20 per hour for twelve-hour days. The court found Dietrich was entitled to recovery of $9000 on his counterclaim, stating as follows:

> Dietrich specifically counterclaimed for the value of the labor he provided to help Milton and Reinhold with planting, harvesting, and other field work in 2016 and 2017. Dietrich seeks compensation for his labor in the amount of $27,360. Dietrich maintains that he spent 114 days during the relevant time period either helping with field work in Iowa or traveling between his home in Michigan and the farm. He further maintains that every day that he worked or traveled, he devoted 12 hours during that day to the task at hand and seeks to be compensated at an hourly rate of $20. Dietrich did not present much

---

[12] The amount of lodging charges is $747 plus $1068.61 plus $235.74, which totals $2051.35, not $1304.35.

documentation of his days of travel or days of work in Iowa, and his testimony at the trial on this subject was not particularly detailed. Even so, the Court concludes that Dietrich spent 25 days in 2016 and 25 days in 2017 helping Milton and Reinhold with field work and worked nine hours per day on average. The Court finds the hourly rate sought by Dietrich is reasonable given that when he was back on the farm he was also helping Reinhold and Milton to manage their farming operation. Accordingly, the Court finds that Dietrich is entitled to a recovery on his counterclaim against Plaintiffs in the amount of $9000 (50 days times 9 hours per day times $20 per hour). The Court will offset this amount against the amount Dietrich owes Plaintiffs.

The Heydes challenge this finding, arguing, "Dietrich agreed to help Milton and Reinhold in their farming operation without compensation," and "this agreement never changed from 2016 through 2017." Several witnesses testified Dietrich agreed to help for no charge. But the agreement was also only supposed to be for the duration of one year and limited to marketing and sale of the 2016 crop as the certified organic operator.

It is undisputed that the deterioration of Milton's health required Dietrich to step in tremendously "and do a heck of a lot of farming" over the next several years, which was "completely unexpected." Dietrich testified it was never expected that he would provide labor to the farm. Maria Heyde acknowledged that, after Milton's heath took a turn, it was "absolutely [Dietrich's] job to get the crop planted." She estimated Dietrich was at the farm providing labor "maybe eight times in '16," which was "maybe more often than '17." The Heydes' hired help unanimously recalled that Dietrich regularly worked at the farm. Jacob Butson testified Dietrich "would come back weekly." According to David Ragsdale, "I was out there helping and then he would show up and help during crops. Putting them in, taking them out." Erlbacher testified, "When it came crop time, planting, dusting, [Dietrich] was the

only one who showed up" from the family; "[h]e was usually there before I was," and he helped "[e]very day 'til he had to go back home." Even Dietrich's brother Raymond, who was critical of Dietrich's farming capabilities, acknowledged Dietrich was involved with the field work.

Upon our review, we conclude Dietrich established his entitlement to compensation in the amount of $9000 for labor he provided for the Heydes during the 2016 and 2017 growing seasons.

## V.      Clean Hands Doctrine

As noted above, the district court concluded Dietrich failed to account for proceeds he received from the Heydes' crops, but that he had established a counterclaim against the Heydes for $9000. Rather than simply subtracting $9000 and granting the Heydes judgment for the difference, the court, sua sponte, invoked the doctrine of "clean hands" to reduce the Heydes' recovery to $74,164.25.

The court found:

> The arrangement Milton, Reinhold, and Dietrich entered into is best described as an artifice, a plan intended to deceive. The sole purpose of this arrangement was to circumvent the consequences to Milton and Reinhold of losing their certification as an organic operation. Under federal law, once they lost their certification, Milton and Reinhold were prohibited from selling their crops as organic and receiving the premium price organic crops command. Rather than forego the higher profits that come with selling organic crops, the three brothers set out to scam the system.

The court also found, "If the Court were to grant [the Heydes] judgment in any amount, it would be lending its aid to the deceptive (and arguably illegal) conduct. At the same time, Dietrich is not wholly innocent in all of this."

The court determined that under the clean hands doctrine and balancing the equities of the case, it should "substantially reduce the judgment . . . otherwise award[ed] [the Heydes] against Dietrich." The court found Dietrich was responsible to pay to the Heydes $74,164.25.[13]

The Heydes moved to reconsider/amend judgment stating, "the Court's ruling includes no analysis or factual findings which would allow the parties to determine the Court's methodology of calculating the amount of the Judgment." In ruling on the motion, the Court found:

> It is the opinion of the Court that each of the parties was equally culpable for the deception practiced on the persons and entities who bought the crops of [the Heydes]. Consequently, the Court decided that $70,000 of the amount [Dietrich] would have otherwise owed to the Estate of Milton Heyde and $70,000 of the amount [Dietrich] would have otherwise owed to Reinhold Heyde should be "canceled," and the balance, $74,164.25,[14] should be paid by [Dietrich] to [the Heydes]. This result fairly balanced the equities of the parties.

The court concluded that this result did not permit Dietrich "to fully escape responsibility for his failure to account for all the money coming into his hands under the arrangement with [the Heydes], while at the same time preventing [the Heydes] from benefiting from their wrongdoing in continuing to sell organic crops after losing their certification."

The Heydes claim the district court improperly determined the clean hands doctrine should be applied. They point out Dietrich obtained certification that he

---

[13] The award would have been $203,417.25 but for the application of the clean hands doctrine. The court reduced the judgment by $129,253 to $74,164.25. In other words, by the court's action, Dietrich retained an additional $129,253 from the proceeds he received from the sale of crops.

[14] Even using the court's calculations, the result here would not be $74,164.25.

was capable of selling and marketing organic crops. They assert the local USDA office was notified and Dietrich signed the appropriate papers to become the operator of the farm. The Heydes contend, "No entity was deceived or taken advantage of. There is no evidence of any wrongdoing or violation of public policy." They state the crops were properly certified as organic.

"The clean hands doctrine stands for the principle that a party may be denied relief in equity based on his inequitable, unfair, dishonest, fraudulent, or deceitful conduct." *Ellwood v. Mid States Commodities, Inc.*, 404 N.W.2d 174, 184 (Iowa 1987).

> The equity maxim of clean hands expresses the principle that where a party comes into equity for relief he or she must show that his or her conduct has been fair, equitable, and honest as to the particular controversy in issue. A complainant will not be permitted to take advantage of his or her own wrong or claim the benefit of his or her own fraud or that of his or her privies.
> The maxim means that whenever a party who seeks to set the judicial machinery in motion and obtain some equitable remedy has violated conscience or good faith, or another equitable principle in prior conduct with reference to the subject in issue, the doors of equity will be shut, notwithstanding the defendant's conduct has been such that in the absence of circumstances supporting the application of the maxim, equity might have awarded relief.

*Opperman v. M. & I. Dehy, Inc.*, 644 N.W.2d 1, 6 (Iowa 2002) (quoting 27A Am. Jur. 2d *Equity* § 126, at 605 (1996)). The clean hands maxim need not be pleaded; it may be applied by the district court sua sponte, as it was here. *See Myers v. Smith*, 208 N.W.2d 919, 921 (Iowa 1973).

The clean hands doctrine should not be applied rigorously and is not favored by the courts. *Cedar Mem'l Park Cemetary Ass'n v. Pers. Assocs., Inc.*, 178 N.W.2d 343, 353 (Iowa 1970); *see also Hora v. Hora*, No. 22-0259, 2023 WL 1809035, at *6 (Iowa Ct. App. Feb. 8, 2023) (noting the clean hands doctrine "is

not a favored doctrine of the courts"); *JP Morgan Chase Bank, Nat'l Ass'n v. Ackley*, No. 12-1338, 2013 WL 1749783, at *1 (Iowa Ct. App. Apr. 24, 2013) ("The defense of the clean hands doctrine is not favored by the courts."); *Butler v. Butler*, 114 N.W.2d 595, 619 (Iowa 1962) (same).

"[T]he application of the doctrine is purely discretionary and . . . it should not be applied where the result would be contrary to public policy." *Cedar Mem'l Park Cemetary Ass'n*, 178 N.W.2d at 353. The doctrine "requires proof that the plaintiff 'dirtied [his hands] in acquiring the rights he now asserts.'" *Hora*, 2023 WL 1809035, at *6 (quoting *Anita Valley, Inc. v. Bingley*, 279 N.W.2d 37, 41 (Iowa 1979)). A party's conduct must not only be wrongful but must be "connected with the present dispute." *Midwest Mgmt. Corp. v. Stephens*, 353 N.W.2d 76, 81 (Iowa 1984). "The conduct must appear to have injured, damaged, or prejudiced [the defendant], or he may not invoke the doctrine." *Id.*

The Iowa Supreme Court has stated:

> Relief is not to be denied because of general iniquitous conduct on the part of the complainant or because of the latter's wrongdoing in the course of a transaction between him and a third person. In other words, the maxim may not be invoked by reason of acts which are not shown to have been connected with the transaction giving rise to the suit or otherwise to have been related to the defendant or anything in which he was interested. When inequitable conduct is shown, the resulting disqualification extends only to the enforcement of equities which are founded upon the matter or transaction which the conduct involved. The question to be resolved is whether the complainant's wrongful conduct is connected with, or related to, the dispute between the complainant and the defendant, and not whether the complainant has been guilty of wrongdoing from which he was benefited.

*Grandon v. Ellingson*, 144 N.W.2d 898, 904 (Iowa 1966). "The equitable rule that a plaintiff asking relief must come into equity with clean hands has reference only

to the relation between the parties, and arising out of the transaction." *Id.* (quoting *Benson v. Sawyer*, 249 N.W. 424, 428 (Iowa 1933)).

By obtaining an organic certification for their farm through Dietrich, the Heydes' conduct did not harm Dietrich. In fact, Dietrich was part of the plan and was aware of the circumstances that led the Heydes to request him to become a certified organic operator. We conclude the Heydes did not have unclean hands as to their brother, Dietrich. For this reason, we find the district court improperly applied the clean hands doctrine to reduce the judgment of the Heydes. As a result, we reverse this portion of the district court order and determine judgment should be entered in favor of the Heydes for the sum of $203,417.25.

## VI. Discovery Sanction

On cross-appeal, Dietrich argues the court "abused its discretion by imposing a discovery sanction which excluded from evidence bank account statements, credit card statements, and other financial records which were necessary to verify the full and complete accounting of the funds at issue in this case."

As the trial date loomed, the Heydes filed several motions to compel discovery and for sanctions against Dietrich, arguing that even after a motion to compel was granted, Dietrich failed to comply with some requests and provided responses to others just shortly before trial, in violation of the court order. The court addressed the motions for sanctions at the start of trial. The court allowed admission of Dietrich's exhibits 111, 112, 114, 116, 117, and 119, which the parties

agreed were submitted before the discovery deadline.[15] But the court excluded exhibits 101 through 110, 113, 115, 118, and 122 "as a sanction" because they were submitted after the court-imposed deadline. On that topic, Dietrich's attorney acknowledged he "underst[oo]d the court's [discovery] order" and that Dietrich's responses "may not [have] compl[ied] exactly with it." The court noted it would allow Dietrich "to provide further explanation and ask the Court to reconsider the exclusion" during his testimony, but no further argument was made.

In imposing sanctions by excluding several of Dietrich's proposed exhibits, the district court acted by its authority under Iowa Rule of Civil Procedure 1.517, which allows the court to impose sanctions on a party who fails to obey the court's order to provide or permit discovery.. We also observe that at trial, when asked, "And you are satisfied that every expense that you have listed on the exhibits that have been introduced into evidence on your behalf accurately show legitimate expenses that you incurred in connection with managing Milton and Reinhold's farmland for the two years that you did that?" Dietrich responded, "To the best of my ability to pull these records together, yes." Finding no abuse of discretion, we affirm on this issue.

## VII.    Conclusion

We affirm the district court's determination that Dietrich was not in a fiduciary relationship with his brothers and therefore a heightened burden on Dietrich should not be imposed. On the appeal, we affirm in part, reverse in part,

---

[15] We also note that although the court at first denied admission of exhibit 123, which was "a summary of the distributions he allegedly made using the proceeds received from the sale of the crops," the court later noted "it was error to exclude any part of Exhibit 123."

and remand with directions to impose judgment in favor of the Heydes in the amount of $203,417.25.  We affirm on the cross-appeal, finding the district court did not abuse its discretion concerning the discovery sanction against Dietrich. Court costs in relation to the appeal and cross-appeal are assessed against Dietrich.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH DIRECTIONS ON APPEAL; AFFIRMED ON CROSS-APPEAL.**